ERWIN H. HAASS AND VIRGINIA A. HAASS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3146–68.  Filed October 14, 1970.

*Paul R. Trigg, Jr.*, and *James W. Collier*, for the petitioners.
*Ralph F. Keister*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency of $80,661.15 in petitioners' income tax for the calendar year 1964.

The only issue for decision is whether petitioners are entitled to deductions for intangible drilling costs on five gas wells located in Erie County, Pa.

### FINDINGS OF FACT

Certain facts have been stipulated and are found accordingly.

Petitioners are husband and wife whose legal residence at the time of the filing of the petition herein was Grosse Pointe Farms, Mich. Using a cash basis method of accounting petitioners filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue at Detroit, Mich.

Petitioner Erwin H. Haass (hereinafter referred to as Erwin) is an attorney admitted to practice in the State of Michigan with offices in the city of Detroit. Petitioner Virginia A. Haass (hereinafter referred to as Virginia) is unemployed but has a substantial independent income.

Petitioners have invested in oil ventures since 1951, investing during that period in between 50 and 100 wells. During this time they have never knowingly and intentionally invested in a well which had been completed and was producing. Erwin had the authority to make investments for Virginia and was in the habit of so doing. Erwin's brother-in-law Robert Allmand (hereinafter referred to as Allmand) was also involved in investment ventures in oil wells. In this connection he had become involved in certain ventures with Allstates Petroleum Corp. (hereinafter referred to as Allstates), a California corporation and its president, Earl Hightower (hereinafter referred to as Hightower), an attorney practicing in the State of California.

In the latter part of 1963 Allmand had informed Erwin of certain drilling ventures in Crawford County, Pa., in which he had participated with Hightower and Allstates and had informed Erwin that it might be possible for him to participate in the next venture in the adjoining Erie County, Pa. Prior to this time Erwin and Allmand had each brought oil and gas drilling ventures to the attention of the other. Erwin questioned why he would be able to buy into a successful drilling venture and Allmand informed him that he might be able to participate in the new venture because of the withdrawal of certain individuals who had previously taken part in the Crawford County venture.

Erwin was at his Florida home from the first to the 12th of September 1964. Allmand called him there and told him that the new venture was available, and Erwin arranged with Allmand for Hightower to call him. Hightower called Erwin the next day at Erwin's home in Florida and told Erwin that there was a 30-percent participation open in the Erie County venture and that the cost of drilling would be $55,000 per well drilled to the depth of 5,500 feet. Erwin questioned the cost of the wells but Hightower was firm as to the drilling cost. Because he desired to consult with his wife, Erwin asked Hightower to call him back the following day. On the following day when Hightower called, Erwin stated to him that he and his wife would each take a 15-percent participation in the venture. While Erwin was still in Florida, Hightower called him again to tell him that there was an additional 5-percent participation available. Erwin stated he would take this 5-percent participation for himself. Erwin frequently made oral arrangements to participate in oil and gas ventures during telephone conversations.

During his conversation with Hightower, Erwin was informed that there would be 10 wells drilled on the properties. Although Erwin was not informed as to who was to do the drilling, he did know that Hightower and Allstates would farm it out since they were not involved in drilling.

Erwin and Virginia each entered into an agreement with Allstates dated October 26, 1964, providing for an escrow account to be handled by the United California Bank in Los Angeles in which petitioners would place specified sums to be disbursed to Allstates upon the delivery in escrow by Allstates of a securities permit from the commissioner of corporations of the State of California, an assignment from Allstates to petitioners, an executed drilling and operating agreement, and an affidavit from an independent petroleum geologist that a well had been drilled and tested to a depth sufficient to test the Medina sand formation. On November 30, 1964, the assignments of the leasehold interests were executed by Allstates and petitioners. Erwin received an undivided eight forty-eighths interest and Virginia an undivided six forty-eighths interest in the oil and gas leases. On that same day, November 30, 1964, petitioners and the other participants in the Erie County venture entered into a drilling and operating agreement with Allstates which provided in part:

PART I

OPERATIONS PRIOR TO PRODUCTION

\*     \*     \*     \*     \*     \*     \*

C. Appointment of Operator

1. Allstates is hereby appointed as Operator by the parties to this agreement and, subject to the other provisions hereof, has full authority to conduct drilling and producing operations and to exercise all of the rights necessary under said oil and gas leases for the purpose of prospecting for, drilling and producing oil, gas and other hydrocarbon substances from the leased lands.

\*     \*     \*     \*     \*     \*     \*

E. Drilling on Leased Land. On or before December 1, 1964, Operator shall commence, or cause to be commenced, operations for the drilling of a well for oil or gas on some portion of the leased lands, and shall thereafter diligently prosecute the drilling of said well to a depth sufficient to test the Medina sand formation, usually found at a depth above five thousand (5,000) feet, or basement equivalent, whichever is shallower, unless oil or gas is discovered in paying quantities at a lesser depth, or unless further drilling would, in the opinion of Operator's geologist, be impractical or impossible.

1. In consideration of Operator drilling and testing said well to a depth sufficient to explore the Medina sand formation, Non-Operator agrees to pay to Operator an aggregate sum of $55,000.00 in proportion to the interest set opposite their respective names as follows:

| Name | Proportionate share Percent | Name | Proportionate share Percent |
|---|---|---|---|
| Allstates Petroleum Corporation | 5 | Virginia A. Haass | 15 |
| Robert A. Allmand | 20 | Earl Hightower | 5 |
| John Calley | 5 | Frank W. Koenen | 7½ |
| James H. Coburn III | 10 | John J. Tuttle | 2½ |
| Erwin H. Haass | 20 | James Gould Wilson | 10 |

2. All costs incurred in the drilling and testing of said well down to a depth sufficient to test the Medina sand formation in excess of Fifty-Five Thousand Dollars ($55,000.00) shall be borne and paid for by Allstates.

F. Operator's Option to Complete.—In the event a zone or zones are encountered in the drilling of said well which in the opinion of Operator indicates the possibility of oil or gas production, Operator shall run an electric log and, at its option, such other logs as it may deem desirable and may take sidewall cores or samples to determine whether or not said Medina zone may be productive of oil and/or gas. In the event the probability of oil and/or gas production from said zone in commercial quantities is indicated, Operator shall take the necessary steps to attempt to complete said test well.

1. All costs incurred in the attempted completion and equipping of said well shall be borne and paid for as follows:

| Name | Proportionate share | Name | Proportionate share |
|---|---|---|---|
| Allstates Petroleum Corporation | 10/48 | Virginia A. Haass | 6/48 |
| Robert A. Allmand | 8/48 | Earl Hightower | 2/48 |
| John Calley | 2/48 | Frank W. Koenen | 3/48 |
| James H. Coburn III | 4/48 | John J. Tuttle | 1/48 |
| Erwin H. Haass | 8/48 | James Gould Wilson | 4/48 |

G. Intangible Drilling Costs.—It is hereby agreed that the participants set forth in paragraph E above shall be entitled to all intangible deductions for the purpose of federal and state taxation with respect to the drilling of any well provided for herein, and it is agreed that such participants and each of them shall be entitled to or be liable for their proportionate share of depreciation or capital losses with respect to items paid for by all participants pertaining to said wells.

## PART II

### OPERATIONS AFTER PRODUCTION

\*         \*         \*         \*         \*         \*         \*

F. Drilling of Additional Wells.

\*         \*         \*         \*         \*         \*         \*

2. All costs incurred in the drilling and testing of each well provided for in this paragraph shall be borne and paid for by the same parties and in the same proportions as set forth in paragraph E, Part I, above.

3. All costs incurred in the attempted completion and equipping of any well provided for in this paragraph shall be borne and paid for by the same parties and in the same proportions as set forth in paragraph F, Part I, above.

\*         \*         \*         \*         \*         \*         \*

G. Cost of Operating.—Each party shall participate in the cost of operating, redrilling, deepening, plugging back or in any other remedial operation upon a well which has been once placed on production in the same proportion as it participates in the production from said well at the time the costs are incurred.

H. Participating in Production.—Any and all oil or gas purchase contracts for the sale of the production from any well drilled hereunder shall not extend for a duration in excess of sixty (60) days (if for the sale of oil) or for a period of time which is in excess of the minimum needs of the industry (if for the

sale of gas) and shall be executed by Operator as agent for Non-Operator. The proceeds from the sale of such production shall be paid to Operator (unless otherwise directed by the parties hereto), who shall account for and distribute said proceeds as follows:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

4. The remaining income, after payment of the foregoing items, shall be divided between the parties and paid on the tenth day of the month following the month in which Operator shall receive payment from such production, to each participant in proportion to its undivided interest as set forth below.

| Name | Proportionate share | Name | Proportionate share |
|------|------|------|------|
| Allstates Petroleum Corporation | 10/48 | Virginia A. Haass | 6/48 |
| Robert A. Allmand | 8/48 | Earl Hightower | 2/48 |
| John Calley | 2/48 | Frank W. Koenen | 3/48 |
| James H. Coburn III | 4/48 | John J. Tuttle | 1/48 |
| Erwin H. Haass | 8/48 | James Gould Wilson | 4/48 |

Wells were drilled on the leased lands during 1964 in the locations and on the dates as follows:

| Well designation | Date drilling commenced | Date drilling completed |
|------|------|------|
| 1. Wilbur Brown #1–22 | 8/ 7/64 | 8/13/64 |
| 2. Liimatainen #1–23 | 8/14/64 | 8/19/64 |
| 3. Otto Brown #1–24 | 9/16/64 | 9/25/64 |
| 4. Bossard #1–25 | 10/ 5/64 | 10/11/64 |
| 5. Byron Griffey #1–26 | 11/ 1/64 | 11/ 8/64 |

The first invoice received by petitioners from Allstates requesting payments with respect to the wells was dated October 9, 1964. Petitioners made payments with respect to these wells in the amounts and by checks dated as follows:

| | Erwin Haass | | Virginia Haass | |
|------|------|------|------|------|
| Wilbur Brown #1–22 | 10/19/64 | $10,500 | [1] 10/19/64 | $10,500 |
| | 12/ 2/64 | 3,500 | | |
| Liimatainen #1–23 | [1] 10/19/64 | 10,500 | [1] 10/19/64 | 10,500 |
| | 12/ 2/64 | 3,500 | | |
| Otto Brown #1–24 | 12/ 2/64 | 14,000 | 12/ 2/64 | 10,500 |
| Bossard #1–25 | 12/ 2/64 | 14,000 | 12/ 2/64 | 10,500 |
| Byron Griffey #1–26 | 12/15/64 | 14,000 | 12/ 5/64 | 10,500 |

[1] These checks were in the amounts shown on the invoice dated Oct. 9, 1964.

Allstates entered into an agreement for drilling and completion of the wells on the leased lands with Ventura Oil Co., a Nevada corporation. The agreement was a turnkey arrangement at a cost of $28,500 for a well to a depth sufficient to test the Medina formation. Erwin, Virginia, and various other individuals involved in the venture have brought suit in the State of California against Allstates and Earl Hightower and other John Doe defendants to recover the amounts paid by them to Allstates in excess of the amounts paid by Allstates

to Ventura for drilling and completing the wells. This suit is still pending.

Allstates advised petitioners by letters dated December 31, 1964, that the following amounts were deductible on their 1964 income tax return as their share of intangible drilling costs for each well:

| Well designation | Erwin H. Haass | Virginia A. Haass | Total |
|---|---|---|---|
| 1. Wilbur Brown #1-22 | $12,517.04 | $9,387.78 | $21,·04.82 |
| 2. Liimatainen #1-23 | 12,635.86 | 9,476.90 | 22, 12.76 |
| 3. Otto Brown #1-24 | 12,762.36 | 9,571.77 | 22, 34.13 |
| 4. Bossard #1-25 | 12,707.44 | 9,530.58 | 22, 38.02 |
| 5. Byron Griffey #1-26 | 11,000.00 | 8,250.00 | 19,2 50.00 |
| Total—all wells | | | 107,839.73 |

These figures were computed in these letters by an allocation of the total amount received from each petitioner to "turnkey" cost, other intangibles, and capital investment. The letter to Erwin with respect to the Wilbur Brown #1-22 well states in this respect as follows:

This is to confirm that the Wilbur Brown #1-22 Well, Erie County, Pennsylvania, has been drilled to a total depth of 3261 feet below the surface of the ground and completed as a commercial gas producer. * * *

Our records indicate that we have received from you during the calendar year 1964 the sum of $14,000.00 in payment of your proportionate share of the "turnkey" cost of the drilling and completion of said well, in compliance with Paragraphs E and F, Part I, of the Drilling and Operating Agreement dated November 30, 1964.

$11,000.00 of this sum should be allocated as an intangible write-off against 1964 income as your proportionate share of the "turnkey" cost of drilling said well; $1,517.04 should be allocated as an intangible write-off, as your proportionate share of the cost of intangibles (services, labor and rental) expended in completing said well; and the sum of $826.32 allocated as a capital investment representing your proportionate share of the cost of the pipe, tubing and other surface equipment necessary to complete said well.

Enclosed for your records is copy of statement of completion costs for said well and refund check of $656.64.

Except for the name of the well and the amounts, each of the other letters to Erwin and the letters to Virginia were identical to the letter to Erwin with respect to the Wilbur Brown #1-22 well.

Allstates filed an election on Form 1065 for the year 1964 to be excluded from the provisions of subchapter K of the Internal Revenue Code of 1954. Petitioners made the election to expense rather than capitalize intangible drilling costs on their income tax return for 1951, the first taxable year in which they incurred such costs. Pursuant to that election petitioners deducted intangible drilling costs on their 1964 joint income tax return and included in the amount so deducted $107,839.73 with respect to the Erie County wells.

Respondent in his notice of deficiency disallowed petitioners' claimed deduction for intangible drilling costs to the extent of the $107,839.73

claimed deduction on the five Erie County wells with the explanation that "it has not been established that you have incurred such costs."

OPINION

Respondent takes the position that petitioners are not entitled to deduction with respect to any of the five Erie County wells for the intangible costs of drilling, since the wells were completed prior to their agreement to participate in the venture. In the alternative respondent contends that if petitioners are entitled to any deduction for intangible drilling costs, they are not entitled to deduct in full the amount they agreed to pay for the turnkey contracts but only their prorata share of the contract cost measured by their participation in the production.

The deduction for intangible costs of drilling and development of oil and gas wells is governed by regulations promulgated by the Secretary pursuant to section 263 (c), I.R.C. 1954.[1]

---

[1] Sec. 263 (c), I.R.C. 1954, provides:

(c) INTANGIBLE DRILLING AND DEVELOPMENT COSTS IN THE CASE OF OIL AND GAS WELLS.—Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

Sec. 1.612–4, Income Tax Regs., issued pursuant to sec. 263 (c), provides in part:

Sec. 1.612–4 Charges to capital and to expense in case of oil and gas wells.

(a) Option with respect to intangible drilling and development costs. In accordance with the provisions of section 263 (c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to operators of any drilling or development work (excluding amounts payable only out of production or gross or net proceeds from production, if such amounts are depletable income to the recipient, and amounts properly allocable to cost of depreciable property) done for them by contractors under any form of contract, including turnkey contracts. * * *

\* \* \* \* \* \* \*

In general, this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest) ; except that in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option. In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, to the extent allocable to fractions of the operating rights held by others, must be capitalized as the depletable capital cost of the fractional interest thus acquired.

The regulations allow a deduction of drilling and development expenses incurred by a taxpayer while an operator. An operator is defined as the holder of a working or operating interest in an oil or gas well. *G. F. Hedges, Jr.*, 41 T.C. 695 (1964). Although the regulations allow the deduction of such costs incurred "prior or subsequent to the formal grant or assignment to [the operator] of operating rights," we do not interpret this to mean that a taxpayer may "incur" expenses as an "operator" prior to the assumption, whether formal or informal, by him of any interest in the operating rights. Under any interpretation of the facts in this case, petitioners had no interest in the Erie County wells prior to the first part of September 1964. The facts show that two of the wells on the properties here involved had been completed prior to September 1, 1964. Therefore, petitioners did not incur drilling and development costs in the first two wells as operators, for they were not operators when the wells were completed. Petitioners paid for an interest in completed wells, albeit that the price they paid was measured by a percentage of the contract price charged by the promoter-operator for each such well. The regulations do not contemplate that investors in oil and gas wells drilled to production may be permitted to designate the costs of the interest in such wells as drilling and development expenses retroactively incurred, thereby being allowed a deduction for intangible drilling costs without assuming the risk of the unknown result of the drilling. See *Phillips* v. *United States*, 233 F. Supp. 59 (E.D. Tex. 1964), affirmed per curiam (C. A. 5, 1965, 16 A.F.T.R. 2d 6051, 66-1 U.S.T.C. par. 9157).

While petitioners in this case were not aware of the completion of the two wells prior to their agreement to participate in the venture, it was within their power to have investigated.

Respondent argues that petitioners did not agree to enter into the venture until November 30, 1964, when they received the formal assignment of their interests. We do not agree with respondent but from the evidence conclude that petitioners reached agreement with Hightower regarding their participation in the venture prior to September 12, 1964. Even though the agreement was oral, it was sufficient for petitioners to qualify as operators for the last three wells drilled. See *G. F. Hedges, Jr.*, *supra*. Erwin frequently entered into oral agreements respecting oil and gas ventures as did the taxpayers in the *Hedges* case. In the instant case, subsequent to the oral agreement there was a formal assignment to petitioners of their interest whereas there was never a written agreement in the *Hedges* case. However, the regulations specifically provide for deduction of intangible drilling costs incurred "prior" to the formal assignment of the operating rights. We therefore conclude that petitioners are entitled to deduct the intangible

drilling costs paid by them in connection with the three wells drilled subsequent to September 12, 1964.

Petitioners claim drilling and development deductions for the amount of the turnkey contract paid by them on each well based on $55,000 per well even though this was in excess of the amount paid by Allstates to Ventura for drilling the wells. Petitioners also contend that they are not limited to a deduction of the prorata amount of the drilling costs measured by the proportionate share of the production which they would receive from the well.

Respondent argues that petitioners are entitled to deduct only those expenses which are in proportion to their share of the production from the well based on the drilling costs paid by Allstates to Ventura. In *G. F. Hedges, Jr., supra,* we held that the taxpayer was entitled to deduct intangible drilling costs based on amounts paid to the operator for drilling the well even though the operator paid lesser cost to the driller. For the reasons stated in the *Hedges* case, we conclude in this case that petitioners are entitled to deduct intangible drilling costs based on the amount per well they agreed to pay the operator, Allstates, and are not limited to the amount Allstates paid to Ventura for drilling the wells.

The issue of whether a taxpayer is limited to a deduction of his prorata share of the drilling costs based on his proportionate share of the production which will go to all operator-participants was not presented in *G. F. Hedges, Jr., supra.* In that case it was carefully pointed out that the promoter-operators were chargeable with their own prorata share of the well cost. In the instant case the promoter, Allstates, is paying a disproportionately small percentage of the contract price in relation to its share of the production and working interest.

Respondent's regulations provide as follows with respect to the portion of drilling and development costs which may be deducted by the owner of a fraction of the operating rights:

Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property * * * except that *in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option.* In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, *to the extent allocable to fractions of the operating rights held by others,* must be capitalized as the depletable capital cost of the fractional interest thus acquired. (Emphasis supplied.)

Petitioners argue that "attributable" as used in this regulation does not mean "allocable" or "proportionate." Based on their interpretation of the word "attributable" petitioners contend that the total amount

of the drilling and development costs paid by them is deductible as intangible drilling costs under respondent's regulations. In our view the last above-quoted sentence of respondent's regulations makes it clear that "attributable" as used in the preceding sentence of that regulation does mean pertaining or allocable to the operator's fractional interest in the venture. The last sentence specifically provides that costs to the extent "allocable" to fractions of the operating rights held by others must be capitalized. Where an operator pays a higher percentage of the drilling and development costs than his fraction of the operating rights, the excess is necessarily allocable to the rights held by other fractional holders of operating rights.[2] In the instant case Allstates held ten forty-eighths of the operating rights. Since Allstates bore only 5 percent of the drilling and development costs, it is readily apparent that approximately 15 percent of the drilling and development costs paid by the operators owning the remaining thirty-eight forty-eighths interest including petitioners who owned a fourteen forty-eighths operating interest were costs which were allocable to fractions of the operating rights held by Allstates. Respondent's regulations specifically provide for the capitalizing of these costs and their recovery through depletion. We therefore conclude that petitioners are entitled to deduct only 29.2 percent of the contract drilling costs of the three wells drilled after they acquired their interest and not the 35 percent of such costs which they actually paid because of the fact that Allstates was not bearing its proportionate burden of such costs. Petitioners must capitalize the difference in the amount of intangible drilling costs they paid and the 29.2 percent of such costs attributable to their fourteen forty-eighths interest and recover this difference through depletion.

Since the completion costs of the wells were borne by each participant in the venture in direct relationship to his proportionate interest in the venture, petitioners are entitled to deduct with respect to the last three wells drilled in 1964 the entire amount of such completion costs they paid to the extent that such costs constitute intangible costs. There is no disagreement between the parties as to the amount of such completion costs which are intangible costs.

*Decision will be entered under Rule 50.*

---

[2] Of course the owners of the working interest or operating rights as a whole must pay the drilling and developments costs necessary for the total production including that which will go to discharge the overriding royalty or royalties. Here there were such overriding royalties, which, of course, were free of all costs. Neither party contends that any portion of the payments by petitioners is "allocable" to such royalty payments. The issue here is solely concerned with the payments allocable to the various fractions of the working interest or operating rights.