TEXACO, INC., Individually and as common parent of an affiliated group, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. H–81–564.

United States District Court, S.D. Texas, Houston Division.

Sept. 28, 1984.

Buford Berry, Dallas, Tex., for plaintiff.

Rick Disney, Dept. of Justice, Tax Div., Dallas, Tex., for defendant.

## MEMORANDUM OPINION

O'CONOR, District Judge.

### A. The Parties and Issue: Drilling for a Deduction

This is a civil action filed by Plaintiff, Texaco, Inc. ("Texaco"), for a refund of corporate income taxes and interest collected from Plaintiff for its taxable years 1963 and 1965–71, inclusive.[1]

Texaco is a corporation organized under the laws of the State of Delaware with a principal place of business in Houston, Texas. Texaco, as common parent, timely filed with the Director, Internal Revenue Service Center, Austin, Texas, the consolidated federal income tax returns for itself and certain of its domestic subsidiary corporations for each of the taxable years in issue[2] and paid to the Internal Revenue Service ("IRS") the total amount of income tax

---

1. Plaintiff raised fourteen issues in its original complaint for a refund of $26,491,000. Plaintiff and Defendant have agreed on resolution of thirteen of those issues, which leaves one issue for trial before the Court. The settlement of the thirteen issues, however, must be approved by the appropriate officials of the Internal Revenue Service, the Department of Justice and, ultimately, by the Joint Committee on Taxation. 26 U.S.C. § 6405 (1976). The Court has subject matter and personal jurisdiction of this action under the provisions of 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1).

2. All references in this opinion to the taxable years in issue are for the twelve month periods ending December 31, 1963, 1965, 1966, 1967, 1968, 1969, 1970 and 1971, unless provided otherwise.

# 1166

liability reported on the consolidated return (Stip. ¶ 1).[3]

As a result of audits of Plaintiff's consolidated federal income tax returns, the IRS adjusted Plaintiff's taxable income as reported in the returns and, as a result, determined that Plaintiff either had overpaid or had underpaid its federal income tax liability. The amount of such overpayment or underpayment, as determined by the IRS for each taxable year in issue is reflected below:

| Taxable Year | Amount of Underpayment or (Overpayment) | Interest |
|---|---|---|
| 1963 | ($3,588,740.) | ($1,129,277.92) |
| 1965 | 7,568,708. | 16,426.90 |
| 1966 | 2,199,817. | 2,130.11 |
| 1967 | 2,256,872. | 2,434.42 |
| 1968 | 10,234,013. | 991,529.27 |
| 1969 | 5,337,728. | 1,212,395.44 |
| 1970 | 11,956,033. | 4,273,630.66 |
| 1971 | 921,024. | 195,686.05 |
| Total Underpaid | $36,885,455. | $5,564,954.98 |

Federal income tax and interest, as stated above, was paid by Plaintiff to the IRS or, in the case of the overpayment, was refunded to Plaintiff by credit against Plaintiff's federal income tax liability (Stip. ¶ 3).

Plaintiff timely filed Claims for Refund (Department of the Treasury, Internal Revenue Service Form 843) or Amended U.S. Corporation Income Tax Returns (Department of the Treasury, Internal Revenue Service Form 1120X) for each of the taxable years in issue, claiming a refund of federal income tax and interest as provided in the following table:

| Taxable Year | Date of Claim | Amount of Tax Refund Claimed | Complaint Exhibit No. |
|---|---|---|---|
| 1963 | June 28, 1974 | $1,111,521 | A |
| 1965 | June 28, 1974 | 1,085,274 | B |
|  | October 10, 1975 | 116,758 | C |
|  |  | 1,202,032 |  |
| 1966 | June 28, 1974 | 1,134,428 | D |
|  | October 10, 1975 | 516,292 | E |
|  |  | 1,650,720 |  |
| 1967 | June 28, 1974 | 1,681,716 | F |
|  | October 10, 1975 | 85,836 | G |
|  |  | 1,767,552 |  |
| 1968 | June 28, 1974 | 2,731,086 | H |
|  | October 10, 1975 | 613,657 | I |
|  |  | 3,344,743 |  |
| 1969 | December 30, 1974 | 1,618,443 | K |
|  | October 10, 1975 | 546,653 | L |
|  |  | 2,165,096 |  |
| 1970 | February 17, 1976 | 872,404 | N |
|  | July 2, 1976 | 12,537 | P |
|  | November 11, 1977 | 4,226,214 | Q |
|  | November 11, 1977 | 821,143 | R |
|  |  | 5,932,298 |  |
| 1971 | February 12, 1976 | 1,082,263 | S |
|  | June 30, 1976 | 0 | S–1 |
|  | November 8, 1977 | 1,053,851 | T |
|  |  | 2,136,114 |  |
| Total |  | $19,310,076 |  |

(Stip ¶ 4)

---

[3] Texaco and certain of its domestic subsidiary corporations, at all times herein relevant, constituted an "affiliated group" as defined in section 26 U.S.C. § 1504.

During the years in issue, Plaintiff erected offshore drilling platforms on oil or gas properties located in the Gulf of Mexico offshore Louisiana and Texas, Copoke Inlet, Alaska and the Santa Barbara Channel, California in which it had a working or operating interest. Each platform was designed and constructed to facilitate the exploration and development of a reservoir at a specific location at which it would be installed. (Stip. ¶ 26).

Moreover, each of the platforms was constructed, transported and erected under Texaco's supervision (or the supervision of the operator of the oil or gas property) by independent contractors. The contractor was selected by means of competitive bids or negotiation (Stip. ¶ 27).

Plaintiff incurred costs in the design and construction phase of platform development for materials and other costs such as labor, fuel, repairs, hauling, and supplies, and an allocable portion of overhead or profit (herein referred to as "other" costs). The costs of actual materials required to construct the platforms during the first phase were capitalized by Plaintiff in the returns for the years in issue, and Plaintiff does not contend that any of these expenses represents a deductible expense. Plaintiff, however, deducted such "other" costs incurred in the offshore design and construction phase as IDC and, on audit, the IRS disallowed the deduction of such other costs.

Plaintiff in this case claims a refund for deduction of "other" fabrication costs associated with the construction of twenty-eight platforms in the Gulf of Mexico, one in the waters offshore the State of Alaska and three in the waters offshore the State of California. A numerical distribution of the platforms in question by type is as follows: in the Gulf of Mexico—eleven self-contained, eleven tender, five three-pile well protector, and one caisson jacket; offshore Alaska—one tender; offshore California—three self-contained.

The sole issue before the Court is the appropriate income tax treatment of certain fabrication costs for offshore platforms.[4] Plaintiff claims that all fabrication costs (other than "material" costs) are deductible as intangible drilling and development costs ("IDC") under Section 263(c) of the Internal Revenue Code of 1954, as amended (the "Code").[5] The United States, on the other hand, urges that all or at least part of the fabrication costs of the offshore platforms must be included in Texaco's basis in the platforms and deducted through the allowance for depreciation.

In order to properly analyze Plaintiff's claims the Court will present an introduction to the design, construction and erection of an offshore platform, discuss and review the current law governing the deductibility of IDC and finally analyze Plaintiff's claims in light of the facts and law.

### B. Offshore Drilling Platforms

#### 1. Platform Design and Development

The erection of an offshore platform at the desired location is the culmination of four phases of operation which may be described as follows: (1) the onshore design and construction phase (including the design and onshore construction of the platform); (2) the load-out and tie-down phase, consisting essentially of removal of the platform from the shipyard or other site or facility of construction in preparation for transportation to the desired location; (3) the transportation phase, consisting of the transportation of the platform to the desired location; and (4) the erection phase, consisting of off-loading, positioning, anchoring and erecting the platform at the desired location.

In designing a platform, information is gathered with respect to water depths, wave height, wave period, storm tides, soil

---

4. The amount involved in this issue is approximately $8,000,000 in disallowed platform deductions.

5. Unless indicated to the contrary, references to sections of the Code are to the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 1, *et seq.,* as it applied to the taxable years in issue.

conditions at the site, well spacing and platform configuration, number and depth of wells desired, size and configuration of the drilling rig to be used. In the ordinary course of business, the construction of a platform is not commenced until a lease is acquired, the existence of hydrocarbons proven through exploratory drilling,[6] and geological maps prepared detailing the extent of the reservoir and number of wells required to produce the oil and gas. Based on this information, the design requirements for the particular platform are formulated. (Tr. 13–15).

After construction the three major sections of each self-contained, tender and caisson jacket platform are loaded on a ship or barge for transport to the platform location. The platforms are erected by skidding or lifting the jacket off the ship or barge by means of a lifting crane on another ship, which positions the jacket at the desired location. The pilings are then driven, until refusal, through the jacket legs to anchor the platform and to support the jacket by welding the top of the jacket legs to the pilings. Finally, the deck section is lifted, positioned and welded to the jacket legs (Stip. ¶ 34).

### 2. Platform Configuration

The design of platforms can be divided into two categories based on their structural configuration: (1) the three-pile well protector platforms and (2) the tender, caisson jacket and self-contained platforms. The three-pile well protector consists of a three-legged, jacket like structure. The protector is anchored by pilings which are driven through the leg of the jacket at the time the platform is installed.

The self-contained, tender and the caisson jacket platforms consist of three major units which are constructed separately onshore: (1) the deck, (2) the jacket, and (3) the pilings. Although constructed separately, the three components are designed as a single integrated unit and are not designed or intended to be used with other components constructed for different locations (Tr. 41, 47). The deck section, which bears the equipment necessary for drilling, is usually constructed as one unit. In some cases, the weight limitations of available lifting equipment requires that large open spaces be left in the deck floor. After installing the deck during the erection phase, steel plate or other decking is lifted into the open areas and welded into place. The jacket is also constructed as one unit. It acts as the support for the deck, and consists of cross-braced tubular steel legs through which pilings can be inserted. The legs, as well as any cross-bracing in excess of 24 inches in diameter, are fabricated from flat steel plate, and welded along the seams and at the joints. All cross-bracing of 24 inches or less in diameter consists of construction grade steel pipe welded at the joints and brace points. Finally, the pilings, also consisting of large tubular steel members, are designed to be inserted through the hollow jacket legs and driven into the sea floor to anchor the platform in position. The pilings are constructed in several sections and welded together during the erection phase (Stip. ¶ 33, Tr. 24–39).

### C. *The Option to Deduct IDC*

Section 263(c) of the Code, and Treas. Reg. § 1.612–4, promulgated thereunder, grant to taxpayers an option to deduct, instead of capitalize, IDC, as that term is defined in the regulation. Section 263(c) is an exception to the general rule of section 263(a) of the Code which provides that no deduction shall be allowed for "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."[7]

---

**6.** As a note of emphasis, the drilling platforms are installed after the taxpayer determines that there is substantial likelihood of commercial quantities of oil and gas. The platforms are prepared for development, not exploratory wells.

**7.** Since the issue before the Court is developed under Section 263(c) of the Code, the substantial number of cases decided under Section 263(a), holding that expenditures that are capital in nature cannot be deducted, are inapplicable to the issue of deductibility of IDC.

Since Section 263(c) of the Code and Treas.Reg. § 1.612–4, promulgated thereunder, do not provide a definitive solution to the issue before the Court, a necessary point of analytical departure is the history of the intangibles option.

The history of the intangibles deduction has been explicated in sufficient detail in decisions by other courts. *E.g., Exxon Corporation v. United States,* 547 F.2d 548, 553–55, 563–64, 212 Ct.Cl. 258 (1976); *Standard Oil Co. (Indiana) v. Commissioner,* 68 T.C. 325, 345 n. 9 (1977). In summary, the option to deduct IDC arose administratively, was questioned by the courts,[8] and finally was enacted as part of the Code in 1954. Section 263(c) of the Code, provides:

(c) *Intangible Drilling and Development Costs in the Case of Oil and Gas Wells.* Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by Congress in House Concurrent Resolution 50, 79th Congress.

Pursuant to the authority provided by this section, the Treasury promulgated Treas.Reg. § 1.612–4. The importance of this regulation is highlighted by the fact that the history of this statute and regulation does not provide a definitive analysis for interpretation of issues arising under Section 263(c) of the Code. The pertinent part of this regulation is provided below:

*Charges to capital and to expense in case of oil and gas wells.*—(a) *Option with respect to intangible drilling and development costs.* In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. They include the costs to operators of any drilling or development work (excluding amounts payable only out of production or gross or net proceeds from production, if such amounts are depletable income to the recipient, and amounts properly allocable to cost of depreciable property) done for them by contractors under any form of contract, including turnkey contracts. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used—

\* \* \* \* \* \*

(3) In the construction of such derricks, tanks, pipelines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas.

In general, this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc. are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. Included in this option are all

---

**8.** In *F.H.E. Oil Co. v. Commissioner,* 147 F.2d 1002 (5th Cir.1945), the Court of Appeals held that the regulation which permitted a taxpayer to deduct expenditures for capital improvements was contrary to law. *Id.* at 1005. This decision prompted Congress to adopt Concurrent Resolution 50, 79th Cong., 1st Sess., 59 Stat. 844 (1945) which recognized and approved the Treasury regulations "granting the option to deduct as expenses such intangible drilling and development costs."

costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest); except that in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option. In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, to the extent allocable to fractions of the operating rights held by others, must be capitalized as the depletable capital cost of the fractional interest thus acquired.

\* \* \* \* \* \*

(c) *Nonoptional items distinguished.* (1) Capital items: The option with respect to intangible drilling and development costs does not apply to expenditures by which the taxpayer acquires tangible property ordinarily considered as having a salvage value. Examples of such items are the costs of the actual materials in those structures which are constructed in the wells and on the property, and the cost of drilling tools, pipe, casing, tubing, tanks, engines, boilers, machines, etc. The option does not apply to any expenditure for wages, fuel, repairs, hauling, supplies, etc., in connection with equipment facilities, or structures, not incident to or necessary for the drilling of wells, such as structures for storing or treating oil or gas. These are capital items and are returnable through depreciation.

As the regulation clearly indicates, the types of expenditures subject to the IDC option are described as "... wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil and gas." As noted above, these are the specific types of costs involved in this case. Clearly, the regulation provides that the costs need not be incurred directly by the taxpayer, but include "... costs to operators of any drilling and development work ... done for them by contractors under any form of contract, including turn-key contracts."

The examples in § 1.612–4 further describe the types of items or activities that constitute drilling and development work which are subject to the IDC option. Specifically, the third example provides that the option applies to amounts paid for intangible costs as described above "which are used ... (3) in the construction of such ... other physical structures, as are necessary for the drilling of wells and the preparation of wells for the production of oil and gas." The stipulated facts and testimony clearly establish that offshore drilling platforms are necessary for these purposes and such fact has been recognized by Defendant, both by its allowance of other intangible costs associated with the same platforms and by Rev.Rul. 70–596, 1970–2 C.B. 68.

The regulation then states that the option "applies only to expenditures for drilling and development items which in themselves do not have a salvage value," but this provision is qualified by the clause which provides that IDC "are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value." [9]

> In seizing upon this isolated word "installation" as controlling the entire operation of the regulation, defendant has grossly misread its own language. The obvious reason for the clause in question is to eliminate a possible contention that the option-type expenditures (labor, fuel, etc.) acquire a salvage value simply because they were connected with the installation of admittedly salvageable proper-

---

**9.** The defendant in *Exxon, supra,* argued that the word "installation" in the above quotation limited the scope of the IDC option only to expenditures incurred at the well site. The Court observed that this interpretation would exclude construction at any place "other than the well site no matter how necessary such pre-installation construction may have been to the drilling and preparation of the well." 547 F.2d at 556. It further noted in this regard:

Finally, the regulation distinguishes the nonoptional items. It states that the option does not apply to "expenditures by which the taxpayer acquires tangible property ordinarily having salvage value." Treas.Reg. § 1.612–4(c)(1). Examples of such items immediately follow and include "actual materials in those structures" and "drilling tools, pipe, casing, tubing, tanks, engine, boilers, machines, etc." All of the listed items are generally of the type that can be purchased by an operator of oil or gas properties.

In the case of derricks, tanks, pipelines and other physical structures necessary to the drilling of wells as described in example three of Treas.Reg. § 1.612–4(a), the intangible costs subject to the optional treatment are those incurred in the construction of such physical structures by the operator (or indirectly by him under any form of contract related to such construction).[10] The actual materials acquired and used in such structures are non-optional items. Similarly, any intangible costs that may be inherent in those materials are not subject to the IDC option.

The other distinction of non-optional items relates to intangible costs connected with equipment, facilities and structures that are not incident to or necessary for the drilling of wells "such as structures for storing or treating oil or gas." The evidence herein shows that offshore drilling platforms are incident to and necessary for the drilling of wells and therefore do not fall within the category recognized by this distinction.

Narrowed by this analysis, the only remaining issue is whether the fabrication costs are ordinarily considered as having a salvage value. The issue before the Court has been considered, discussed and decided by the United States Court of Claims in *Exxon, supra*[11] and the United States Tax Court in *Standard Oil Co. (Indiana), supra.*

The *Exxon* Court found it necessary to deal with the question of salvage due to the type of platforms at issue in that case. The record there showed that the platforms in issue were "templet-type" platforms. A templet-type platform was described generally as a large deck area, on which are mounted derricks and various other drilling equipment, all supported above sea level by "templets", which are compound, trussed structures, analogous in function to table legs, but composed of several large vertical steel beams and pipes arranged in a rectangular fashion with bars running between the pipes for support and spacing. This basic templet unit came in only two sizes, 10 feet × 10 feet and 20 feet × 20 feet. The record in *Exxon* showed that Exxon

ty. Thus, as plaintiff correctly observes, the clause in no way restricts the application of the regulation but instead expands it to include a situation where option-type expenditures can be related to salvageable property without losing their own characterization as non-salvageable items. *Id.*

**10.** Therefore, Treas.Reg. § 1.614–4 does not permit an operator to look behind a mere purchase or other acquisition of materials and claim IDC treatment for intangible costs that his supplier may have incurred in manufacturing those materials, but any work performed by or for the operator in order to utilize such materials and construct the structure would be covered by the regulation. This distinction between intangibles incurred during the operator's construction activities (whether by direct or indirect contract) and the intangibles inherent in materials acquired for use in such construction is clearly evident when example three of the IDC regulation is compared with paragraph (c) thereof dealing with non-optional items. The word "tanks" is used both places. Thus, if the tank is constructed by the operator (or constructed for him under a contract), the intangible costs are subject to the optional treatment. If a tank is acquired in any other manner, such as by purchase, the intangible costs incident in such tank (that may have been incurred by the supplier or manufacturer) are not subject to optional treatment by the operator.

**11.** Under the Federal Courts Improvement Act of 1982, P.L. 97–164, 96 Stat. 25, 35 the United States Court of Claims has been reconstituted as the United States Court of Appeals for the Federal Circuit. In *South Corporation v. United States,* 690 F.2d 1368 (Fed.Cir.1982) (en banc), the Court adopted "that body of law represented by the holding of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982 ...." *Id.* at 1370.

had dismantled and recovered materials from salvaged platforms which it reconditioned and used in other platforms. The dismantling generally occurred in a reverse order of the prior erection and assembly process. The dismantled platform parts which were roughly the same prefabricated parts as existed at the completion of the land phase contract would then be taken ashore and stored. Therefore, the templet-type platforms involved in *Exxon* were designed so that they could be dismantled into their component parts, stored and reused as a part of subsequent platforms.

The *Exxon* court analysis rested exclusively on the language of Treas.Reg. § 1.612–4. The only costs in issue before the *Exxon* court were for labor, fuel, repairs, hauling, supplies, which the court concluded were incident to and necessary for drilling wells at sea. Based on this conclusion, the *Exxon* court reasoned that since the expenditures in themselves do not have a salvage value, such costs are deductible within the terms of the literal language of Treas.Reg. § 1.612–4(a).[12] 547 F.2d at 559 (Davis, J. concurring); 547 F.2d at 566.

One judge dissented in part on the basis of the specific facts in *Exxon*, stating that his opinion did not "consider with respect to the IDC option the other types of offshore structures used by oil companies in 1954, such as ... jacket type platforms." 547 F.2d at 5, n. 23. His dissent is based primarily on (1) the fact that "the templets were designed to be salvaged as a component part in unit form," and (2) the findings of the trial judge that "after considerable modification and reconditioning, most of the salvaged parts of the platforms ... were reusable at least once in other platforms." The judge noted that "the basic unit design of the templet was never altered" and that "as a result, the labor, fuel, and supplies utilized to fabricate the links of pipe and steel beams into a templet were permanently integrated into the templets and thereby had a salvage value."

It is plaintiff's contention that the majority opinion in *Exxon* is the correct interpretation of Treas.Reg. § 1.612–4. Since the only costs in issue in the case at bar are specifically enumerated in the regulation as qualifying for the option and since these expenditures in themselves do not have a salvage value, such costs are deductible as IDC without regard to any question of whether the platform or its components are salvageable. The Court, however, rejects Plaintiff's argument based on the reason announced by the Tax Court in *Standard Oil (Indiana), supra,* that the intangible costs of converting raw materials, which in themselves do not have an intrinsic salvage value, into salvageable components would preserve the integrity and value of the intangible cost. Thus, as observed by the Tax Court "the [intangible] costs of turning angle iron [which has salvage value] into a salvageable templet would not be IDC." *Standard Oil (Indiana), supra* at 400. Although the court in *Standard Oil (Indiana)* reached the same result as the *Exxon* court, it applied a different rationale to support the decision. The *Standard Oil*

---

**12.** Judge Bennett in his concurring opinion reasoned that the government's position regarding the deductibility of fabrication costs would result in a cumbersome and complicated administrative and accounting nightmare. He observed:

> If, however, certain otherwise intangible drilling costs are to be capitalized, according to defendant's theory, it would become necessary to determine exactly what components of the final assembly could be saved as they are and subsequently reused. This would not be an easy exercise.
>
> . . . . .
>
> Were we to follow defendant's reading of the regulation, the accounting for each platform

would potentially revolve about fact problems not at all readily resolved or resolvable. Considering the number of platforms built (with changing technology) by a variety of drilling operators since 1954, and yet to be built, the problem takes on staggering proportions. For the added reason that defendant's interpretation of the regulation would be altogether cumbersome in application for the taxpayer, the IRS, and for the Courts when the first two cannot agree, the Court does well to avoid that interpretation and to stand by the reading that it adopts.

547 F.2d at 560.

*(Indiana)* case involved costs incurred in fabricating jacket-type drilling platforms—specifically, a four-pile tender platform and an eight-pile self-contained platform.[13]

In *Standard Oil (Indiana)* the Commissioner of Internal Revenue contended that the entire cost of constructing the platforms constituted expenditures to acquire tangible property ordinarily considered as having a salvage value, which expenditures did not come within the option to expense IDC. The Tax Court held:

> In excluding from the option expenditures for ordinarily salvageable tangible property, the Treasury, and now Congress, appears to have drawn the line such that expenditures that ordinarily are economically unrecoverable should the well be dry, whether or not such expenditures are "represented by physical property," are to be included within the option, whereas expenditures for items which ordinarily are recoverable, even if the well is dry, are excluded from such option.

77 T.C. 349 at 396–397.

Under this construction of Treas.Reg. § 1.612–4, the Tax Court considered that when the ultimate tangible property resulting from a chain of drilling, development construction, etc., activities (such activities being of the type covered by the IDC option) is ordinarily considered as having a salvage value, none of the costs of acquiring or constructing such property is IDC. If such tangible property is not ordinarily considered as having a salvage value, the intangible-type costs expended to integrate materials (which were prior to such integration, usable in such a fashion that they would be ordinarily considered as having a salvage value) into a component which is, after such integration, not ordinarily considered as having a salvage value, are IDC. Under this standard it was necessary for the Tax Court to decide: (1) whether the platforms as a whole are ordinarily considered as having a salvage value; and (2) if not, whether the intangible-type costs in issue were expended to integrate materials which were, prior to such integration, usable in such a fashion that they would be ordinarily considered as having a salvage value, into components which are, after such integration, not ordinarily considered as having a salvage value.

The Tax Court applied this test to the question of whether the platforms, or any of their components, are ordinarily considered as having a salvage value. It held that the platforms themselves clearly had no salvage value. The evidence showed that no platform had ever been salvaged or reused in its entirety at the end of its useful life. The Tax Court made the same findings with respect to the costs incurred in fabricating the components of the platforms.

> [T]he only discrete components mentioned by the parties after the "materials" level are the jacket, pilings and deck. Thus, using our stated formula, we must determine whether any or all of these components are ordinarily considered as having a salvage value.

77 T.C. at 401–02.

The Court noted that the jackets and pilings were installed in a manner in which they ordinarily could not be considered as having a salvage value. By welding and then grouting the pilings into the jacket legs, recovery of those items became unfeasible. The court looked to the experience of Conoco and Standard Oil Co. (Indiana) which revealed that out of 51 of these types of jackets, only one has ever been moved from one location to another after being installed. The Tax Court, therefore, found that the jackets and pilings are not ordinarily considered as having a salvage value.

The Tax Court reached the same decision with respect to the decks. Standard Oil Co. (Indiana) moved only one of 51 decks from its initial installation site to another. The Tax Court found that of the 500 platforms

---

**13.** The *Standard Oil (Indiana)* case, like the case before the Court, did not involve the templet type platform.

installed in the Gulf of Mexico, Shell Oil Co. reused only one deck, and then only after substantial reconditioning. Accordingly, the Tax Court held that the decks did not ordinarily have a salvage value.

Defendant argues that the issue of whether a platform fabrication expense may be deducted in the year incurred as IDC is inextricably intertwined with the concept of risk,[14] that based on this symbiotic relationship, the question of whether a platform is ordinarily considered as having a salvage value should be calculated during the platform's drilling phase and not at its estimated useful life because that is the time when the taxpayer will determine whether the platform or its components is considered reusable. Relying on these premises, Defendant draws on the analysis developed by the *Standard Oil (Indiana)* court which stated:

> If an item ordinarily has salvage value, expenditures for that item are not subject to the risks of the drilling activity. If it does not, then expenditures for such an item (or, in the purest case, where the expenditure is not represented by an item) will be absolutely unrecoverable should the well be dry.

77 T.C. at 397.

Accordingly, Defendant contends that under the risk analysis salvageability should be determined at the drilling phase. This argument introduces the implied issue presented to the Court by this case: what is meant by the term salvage value.

An analysis of this issue requires the Court to address the rationale which was integrated into the risk analysis by the Tax Court presented in *Harper Oil Co. v. United States*, 425 F.2d 1335 (10th Cir.1970). In *Harper Oil* the Court of Appeals addressed the issue of whether expenditures for surface casing, which is an outer casing of steel pipe used to preserve the integrity of a drilled well, were within option. In that case, the taxpayer sought to deduct

the cost of surface casing, which under state law the taxpayer was required to cement into the wellbore when fresh water strata were encountered during the drilling process. Thus, in a practical sense, the surface casing was not salvageable. The taxpayer argued that although casing is listed as an example of "tangible property ordinarily considered as having a salvage value," the cost of surface casing used in this context was at risk regardless of the productivity of the wells because state law prohibited removal. The Court of Appeals rejected the taxpayer's claim, reasoning that "ordinarily", as used in the salvage value phrase, should be construed broadly to the general nature of an item and not to specific use. Thus, the Court concluded: "Casing is casing. And casing 'ordinarily' has salvage value." *Harper Oil Co., supra* at 1343.

Integrating the *Harper Oil* analysis into its risk analysis, the Tax Court adopted the following formula to resolve the salvage value question in the offshore platform context:

> when the ultimate tangible property resulting from a chain of drilling development, construction, etc., activities (such activities being of the type covered by the IDC option) is ordinarily considered as having a salvage value, none of the costs of acquiring or constructing such property are IDC. If such ultimate tangible property is not ordinarily considered as having a salvage value, then the intangible type costs expended to integrate materials which were, prior to such integration, usable in such a fashion that they would be ordinarily considered as having a salvage value, into a component which is, after such integration, not ordinarily considered as having a salvage value, are IDC. Any further intangible-type costs expended to integrate this "first unsalvageable component" into the ultimate tangible property, which is not

14. Although this is the basis for Defendant's argument, it is well recognized that "the deduction for IDC goes hand-in-hand with the taking of risks." *Standard Oil (Indiana)*, 77 T.C. at 397;

*Standard Oil Co. (Indiana) v. Commissioner*, 68 T.C. 325, 350 (1977). *See Haass v. Commissioner*, 55 T.C. 43, 50 (1970); *United States v. Cocke*, 399 F.2d 433, 452 (5th Cir.1968).

ordinarily considered as having a salvage value, are IDC.

*Id.* at 400.

The Tax Court applied this analysis, which reconciles clearly with the *Harper Oil* analysis to a practical example, stating:

Thus, the costs of turning iron ore into salvageable angle iron are not IDC, and the costs of turning angle iron into a salvageable templet would not be IDC. However, the costs of turning sheet metal, which up until that point is usable in such a fashion that it would be ordinarily considered as having a salvage value, i.e., it could still be utilized in an ultimately salvageable asset, into an unsalvageable piling (assuming that such piling is not ordinarily considered as having a salvage value) would, assuming the platform is unsalvageable, qualify as IDC.

*Id.*

■ Clearly, the test of salvage value should be applied at the time the tangible property is no longer useful to the taxpayer in his trade or business. *Cf. Massey Motors, Inc. v. United States,* 364 U.S. 92, 95, 97–99, 80 S.Ct. 1411, 1413, 1415–16, 4 L.Ed.2d 1592 (1960) (holding that the useful life of property is measured by its useful life in the taxpayer's trade or business). Treas.Reg. § 1.167(a)–1(c). However, this test should not be applied retroactively or speculatively. The salvage value component of the IDC regulation is modified by the words "ordinarily considered as." Thus, the test should be applied at the time the property is acquired by the taxpayer and if the tangible personal property is ordinarily considered as having a salvage value.

An objective review of the evidence indicates that the taxpayer's platforms and its major components are not, at the time of acquisition, ordinarily considered as having a salvage value.

D. *Salvage Value of Platforms.*

1. *Taxpayer's Platforms*

■ Plaintiff had approximately 100 platforms in operation during the years relevant to this action. Of these platforms, Plaintiff either abandoned, salvaged, dismantled or relocated only four platforms. Tr. 47.

In 1974 the M.P. 95–A three-pile well protector platform was dismantled, removed and junked to the Sutton Scrapyard at Morgan City, Louisiana, when the Main Pass Block 95 lease was surrendered by Texaco (Stip. ¶ 25). This platform was dismantled and brought to shore because an operator was not allowed to dispose of the platform in an offshore location. (Tr. 85–86). The junked well protector was sold to Sutton Scrap Company and cut up for scrap (Tr. 44).

The M.P. 95–B, a three pile well protector platform, was dismantled and removed in 1974 and sold as junk to the Sutton Scrapyard at Morgan City, Louisiana, when the lease with respect to the Main Pass Block 95 was surrendered by Texaco. The junked well protector was sold to J. Ray McDermott & Co., Inc. for $1.00 (Tr. 45). Again, Texaco brought the platform onshore because there was no allowance for offshore dumping at the time (Tr. 85–86).

The S.M.I. 11 # 35 three-pile well protector platform was removed in 1971 when the location proved unproductive and reerected in 1971 on South Marsh Island Block 11 identified as S.M.I. 11 # 39 platform (Stip. ¶ 25). After the dry hole, the well protector was brought onshore and modified by the addition of deck beams, steel wires, handrails. New pilings were fabricated and the platform was reinstalled as the S.M.I. 11, # 239 platform (Tr. 45).

Texaco was able to reuse a portion of this platform only due to very unusual circumstances (Tr. 91–92). It was not a deep structure (standing in only 70 feet of water) and, therefore, could be removed in one piece. It was designed for a block in which there happened to be other locations with very similar characteristics (Tr. 45). In addition, there happened to be a need for a platform of this type at the time it was removed.

The S.M.I. 38–C, four-pile, six well tender platform was dismantled and removed in 1972 when production from such platform ceased. Prior to the planned removal of the South Marsh Island 38–C platform, a fire occurred at the Eugene Island, 215–B platform and it was decided by Amoco, the operator on both South Marsh Island 38 and Eugene Island 215, to sue the South Marsh Island 38–C deck to replace the Eugene Island 215–B deck which had been destroyed in the fire (Tr. 46).

## 2. *Salvage Value of Platforms*

The evidence revealed that at the end of their 20 year estimated life the platforms have no salvage value (Tr. 56). Indeed, Texaco accrues an annual liability on its books to account for the estimated cost, in excess of scrap value, of dismantling and removing the platform at the end of its normal useful life (Tr. 43).

Texaco's actual experience confirms that the platforms ordinarily do not have a salvage value. Moreover, since each platform is designed and constructed for use at a specific site, the evidence reveals that as a practical matter neither a platform nor its major components are salvageable. Texaco, as operator, has only been able to reuse in its offshore drilling operations one platform (the South Marsh Island 11, # 35).[15] This was a highly unusual case where the site conditions were suitable for reuse of the major components of a platform. Texaco's experiences were confirmed by evidence from other oil companies. The Court heard testimony from executives from Shell Oil Company ("Shell Oil"), Union Oil Company ("Union Oil") and Conoco, Inc. ("Conoco"). Tr. 115–90. The executives testified that offshore platforms are designed and constructed for a specific site. Tr. 112 (Conoco); Tr. 144–45 (Shell Oil).

Additionally, the witnesses testified that although they do not expect to reuse or salvage any part of an offshore platform, the decision to reuse a platform or component is governed by economics. Tr. 120, 124, 133 (Conoco); Tr. 160, 164 (Shell Oil); Tr. 188 (Union Oil). In other words, the decision to reuse a platform or its components is based on an analysis of the cost of designing and developing a platform or component versus reusing or modifying a salvaged platform or component.

It should be restated that the various components (pilings, jacket and deck) are designed as a unit and not independently (Tr. 41, 140). Therefore, a component from one platform typically could not be utilized as a component on a different platform. Furthermore, actual experience shows that by the time a component is ordinarily salvaged, all components are useless due to metal fatigue, corrosion, and technical obsolescence (Tr. 125).

Although components typically are not salvaged prior to the end of the platform's estimated useful life, they nevertheless generally could not be reused at a different location even if Texaco wanted to move them immediately after installation. With respect to the pilings, federal regulations require that they be cut off 15 feet below the mudline (Tr. 71). The pilings are driven to a depth below the mudline that, in many instances, is in excess of the length of pilings which is contained within the jacket. Since it is physically impossible to remove this portion of the pilings, such portion could not be salvaged under any circumstances (Tr. 123). With respect to any portion of the pilings that are contained in the legs of the jacket and that in limited circumstances could be physically salvaged, the specific design requirements

---

**15.** Interestingly, Defendant concedes that transportation costs incurred by the taxpayer while moving the platform to the initial site are IDC reasoning that "[t]he costs of moving and assembling the derrick parts ... will have to be reincurred even though the derrick itself is ordinarily considered to be reusable." Defendant's Reply Brief, p. 4. Yet, under Defendant's interpretation of the risk analysis, the transportation costs would be salvageable when in the few extraordinary instances a platform is reused at another site equidistant to shore as the original site without first returning the platform on shore. Thus, it would follow that if a taxpayer salvaged transportation costs by moving a deck from one site to the other, then the transportation costs of the deck are salvageable and not risked.

of the pilings make it unlikely that they could be suitable for reuse at a different location. Pilings have varying wall thicknesses, diameters and lengths. Since these specifications are closely related to the interior size of a jacket, it is unlikely that the piling could be reused in a different jacket. Furthermore, since the pilings are the cheapest of the three components, it is likely that it would be more economical to construct new pilings than to retrieve and modify old pilings (Tr. 83).

Jackets are also designed for a specific site making it unlikely that they could be reused at a different site. Due to the fact that the jacket is in the water, it will suffer rapid deterioration. Further, during the years in issue the design requirements imposed upon platforms increased significantly (Tr. 125, 126). A jacket designed for the same location just a few years earlier would be structurally different from the later platform. A further limiting factor is the size of the jackets. Once a jacket is over a certain size, the cost involved in lifting and transporting the jacket makes it uneconomical and, in some cases, physically impossible, to reuse the jacket (Tr. 103). Finally, even the most minor of modifications are so expensive that they can rival the fabrication costs of a new jacket (Tr. 175). The ability to salvage a deck is also limited by similar and other factors. A deck is not only designed to integrate with a jacket; it is designed specifically to accommodate a specific drilling rig. A drilling rig, which is specifically designed for certain depths and strata, requires that the decks on which it is located meet many requirements including those of load and stress. Thus, even though a used deck under unusual circumstances might be fitted onto another jacket, it would not necessarily follow that the deck would be acceptable for drilling purposes. Additionally, if a deck is beyond a certain size, it cannot be moved in one piece but must be cut into several sections in order to be transported.

The evidence indicates however that under unusual conditions, the major components of a platform may be salvaged after substantial modifications. Plaintiff argues that "[s]ince this modification would be, in large part, additional fabrication costs incurred to disassemble and reform the jacket, the 'other' costs would add little or no value to the reformed jacket." Brief for Plaintiff, p. 49–50. Defendant responds, arguing that "[t]he important point is that if a deck or jacket can be modified and reused should the well be dry, then the taxpayer has 'salvaged' a portion of the original fabrication costs." Defendant's Reply Brief, p. 5.

The Court finds Defendant's argument without merit for two reasons. First, Defendant fails to draw the line at what point a component is salvageable upon modification. Clearly, if the economics are positive, any deck which is unsalvageable initially can be disassembled into its major sections of salvageable material and reassembled into a new component of a platform section. This is hardly a factual basis on which to premise a risk analysis. Secondly, Defendant's argument ignores the "casing is casing" analysis of the *Harper Oil* court. The Court of Appeals held that the option did not apply to casing because as a general proposition casing is salvageable. Yet, in this case, the Court is presented with facts which indicate that a platform or its components are salvageable as a general rule only after substantial modification. The Court does not consider this premise for the risk analysis sound.

Thus, as a general proposition, it is clearly the evidence that taxpayer and other major oil industry offshore explorers do not consider a platform or its components as ordinarily having a salvage value.

### E.  *Conclusion*

The sole issue before the Court is whether the "other" costs incurred by the taxpayer during the design and construction phase of platform development, when integrated into tangible property, are ordinarily considered as having a salvage value and, therefore, not deductible in the year incurred as IDC. As the facts in the record indicate, a platform and its major

components are not ordinarily considered as having a salvage value, and, therefore, are deductible as IDC in the year incurred. Accordingly, Plaintiffs should be allowed to deduct the "other" costs incurred in platform design and construction.